IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

THOMAS H. DEHUFF PLAINTIFF

CIVIL ACTION NO. 3:08CV327TSL-JCS

v. Consolidated with:

CIVIL ACTION NO. 3:08cv-380-DPJ-JCS

DIGITAL ALLY, INC. and
CHARLES A. ROSS, JR.
(a/k/a ANDY ROSS) DEFENDANTS

**PLAINTIFF'S MEMORANDUM OF AUTHORITIES**
**IN OPPOSITION TO DEFENDANTS' *SECOND* MOTION FOR SUMMARY JUDGMENT**

***Introduction***

The sole legal argument upon which the Defendants have based Defendants' *Second* Motion For Summary Judgment can be summarized as follows:

> Defendants assert they are entitled to declare the April 8, 2005 Agreement void because DeHuff was not a "registered" "broker" of "securities" under federal and state securities laws.

In considering the Defendants' *Second* Motion for Summary Judgment, the Court must first decide whether there are whether any genuine issues of material fact exist with regard to this issue, viewing the evidence presented in the light most favorable to DeHuff, the nonmoving party. *McKee v. Brimmer*, 39 F.3d 94, 96 (5th Cir. 1994). If the Court finds any issues of material fact, Defendants' Second Motion for Summary Judgment must also be denied. *Id.*

Federal law governs questions involving the interpretation of a federal statute.

*Hossaini v. Western Missouri Medical Center*, 140 F.3d 1140, 1143 (8th Cir.1998). However, equitable determinations are governed by the law of the forum. *Regional Properties, Inc. v. Financial & Real Estate Consulting Co*., 678 F.2d 552, 562-63 (5th Cir.1982).

**I. Section 29(b) of the Exchange Act cannot be used to void the April 8, 2005 Agreement because the April 8, 2005 Agreement does not involve a "prohibited transaction".**

Section 29(b) of the Exchange Act provides:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract ... heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract, and (2) as regards the rights of any person who, not being a party to such contract, shall have acquired any right thereunder with actual knowledge of the facts by reason of which the making or performance of such contract was in violation of any such provision, rule, or regulation ....

15 U.S.C. § 78cc(b).

Alleging that DeHuff "effected" securities by helping Defendant Ross "raise capital" for Defendant Digital Ally, Defendants' allege DeHuff violated § 15(a)(1) because DeHuff has admittedly never been a registered "broker or dealer" and therefore the April 8, 2005 Agreement should be rescinded under § 29(b).

Before a party can avoid a contract under section 29(b) the party must first prove the following elements: (1) the contract involved a "prohibited transaction," (2) he is in contractual privity with the defendant, and (3) he is "in the class of persons the Act was designed to protect." *Regional Props., Inc. v. Fin. & Real Estate Consulting Co*., 678 F.2d 552, 559 (5th Cir.1982). In demonstrating that the contract involves a "prohibited transaction," the party seeking to avoid the

contract "must demonstrate a direct relationship between the violation at issue and the performance of the contract; i.e., the violation must be 'inseparable from the performance of the contract' rather than 'collateral or tangential to the contract." *Berckeley Inv. Group, Ltd. v. Colkitt*, 455 F.3d 195, 205 (3d Cir.2006).

Regardless of whether DeHuff was a "broker" and should have registered in regard to his efforts in assisting Defendants raise capital, there is no question that the contract at issue, the "April 8, 2005 Agreement", does not involve a prohibited transaction, does not involve the "sale" of "securities" to third parties, but rather is a tangential agreement that can be performed without violating securities laws. DeHuff explained the April 8, 2005 Agreement in paragraphs 11-15 of DeHuff's Affidavit (Exhibit #7):

> 11. Between April 7-8, 2005, Andy Ross traveled to Brookhaven, Mississippi to give a presentation to shareholders and others interested in Defendant Digital Ally, Inc. During his visit to Brookhaven, Andy Ross and I discussed the fact that I was owed a significant amount of stock based on our previous agreements.
>
> 12. In paragraph #45 of Defendant Ross' Affidavit, he admits that we discussed the new agreement and Defendant Ross admits the exact terms that we discussed.
>
> 13. As a result, in order to resolve any claims of breach of any our prior agreements, we reached a new agreement April 8, 2005 (hereinafter referred to as the "April 8, 2005 Agreement").
>
> 14. Pursuant to the April 8, 2005 Agreement, I agreed to (a) forgo all rights I had under the prior stock agreements against Andy Ross and/or Digital Ally, Inc. and (b) forego any additional claims for a commission "on money raised" by the Plaintiff, in exchange for the Andy Ross' agreement that Digital Ally would issue and/or deliver to me an additional 150,000 shares of stock (the "April 8, 2005 Agreement"). This agreement negotiated and reached in Mississippi as I was driving Andy Ross back to the airport in Jackson, Mississippi on April 8, 2005. As was my regular practice to try to keep a written record of significant conversations such as this while the matter is fresh in my memory so that I can record the information correctly, I made a note of this conversation with Andy Ross in a spiral binder notebook. A true and correct copy of the page from my notebook containing this entry is attached as Exhibit #19 to Plaintiff's Response in Opposition to

Defendants' First Motion For Summary Judgment.

> 15. The terms of the April 8, 2005 Agreement were as follows: Digital Ally would issue and/or deliver to me 50,000 shares now, 50,000 shares due before 2005 ends, and 50,000 shares due before 2006 ends.

See paragraphs # 11-15 of DeHuff's Affidavit (Exhibit #7).

Since there is no question that the April 8, 2005 Agreement does not involve a prohibited transaction and can be performed without violating securities laws, Defendants cannot use §29(b) as an affirmative defense to avoid the April 8, 2005 Agreement.

## II. Alternatively, genuine issues of material fact exist with regard to whether DeHuff was acting as a "finder" or whether DeHuff was acting as a "broker" and was required to registered under the Act.

Section 15(a)(1) provides that a broker or dealer must be registered in order to effect a transaction in securities. Under the Exchange Act, a "broker" is defined as "any person engaged in the business of effecting transactions in securities for the account of others." 15 U.S.C. § 78c(a)(4)(A).

Similarly, Mississippi Code Annotated §75-71-105(b) defines the term "broker-dealer" as a person engaged in the business of effecting transactions in securities for the account of others or for his own account. In the absence of any Mississippi case law on this question, and since the definition of "broker" under federal law is virtually the same as the definition of "broker-dealer" under Mississippi law, in the absence of interpretations at the state law level, the Mississippi courts and regulators would apply the federal interpretations to determine whether a person's activities would meet the definition of "broker-dealer" under state law.

It is often observed:

> "Engaged in the business" is not defined by statute. Cases and SEC No-

> Action letters interpreting the phrase have indicated that regularity of participation is the primary indicia of being "engaged in the business." See, e.g., *SEC v. Margolin*, 1992 WL 279735, *5 (S.D.N.Y.) (citing *Massachusetts Fin. Servs., Inc. v. Securities Investor Protection Corp*., 411 F.Supp. 411, 415 (D.Mass.1976)). Regularity of participation has been demonstrated by such factors as the dollar amount of securities sold, see *SEC v. National Executive Planners, Ltd.*, 503 F.Supp. 1066, 1073 (M.D.N.C.1980) ($4.3 million of securities*13 sold); *UFITEC, S.A. v. Carter*, 20 Cal.3d 238, 142 Cal.Rptr. 279, 571 P.2d 990 (1977) (several million dollars of securities sold); and the extent to which advertisement and investor solicitation were used, see *SEC v. Deyon*, 977 F.Supp. 510, 518 (D.Me.1997) (substantial solicitation); *National Executive Planners*, 503 F.Supp. at 1073 (investors solicited actively); Joseph McCulley, SEC No-Action Letter, [1972-73 Transfer Binder Fed. Sec. L. Rep. (CCH) ¶ 78,982, at 82,111 (Aug. 2, 1972) (advertising "on a single, isolated basis" is not enough, but more than that would require registration)]. A corporation could be a broker even though securities transactions are only a small part of its business activity. See UFITEC, 142 Cal.Rptr. 279, 571 P.2d at 994 (citing 2 Louis Loss, Securities Regulation 1295 (1961)).

*Securities and Exchange Commission v. Keeton Capital, LTD*, 69 F.Supp.2d 1, 11 (D.C.D.C.1998). Unlike the defendant in Keeton, however, DeHuff was never a registered securities professional" and never held himself out as being "engaged in the business" of effecting transactions in securities. As DeHuff explained in paragraphs 24-38 of his Affidavit (Exhibit #7):

> 24. Before I began introducing potential investors to Defendant Ross, Defendant Ross assured me that he, the President, Chief Executive Officer, Treasurer and the only officer and only director of Defendant Digital Ally had and was consulting with experienced securities law attorneys and other persons with expertise in federal and state securities law and Defendant Ross assured me that all of the stock transactions that involved investors that I introduced Defendant Ross to and the stock transactions for which I purchased stock for my own account were "exempt" under or complied with state and federal securities laws.
>
> 25. Although I have experience as an business entrepreneur and management experience, I am not experienced with what circumstances call from private individuals such as myself to be registered as "brokers" of securities under state or federal securities laws, nor was I familiar with the legal consequences of failing to register as a "broker" of securities under state and/or federal securities laws.
>
> 26. Furthermore, I did not believe I was acting as a "broker" of

securities in these transactions at the time. I still do not think I was acting as a "broker".

27. Throughout my dealings with the Defendants, I believed Defendant Ross had was consulting experienced securities law attorneys and other persons with expertise in federal and state securities law regarding our agreements for stock of Digital Ally and I relied on Defendant Ross' representations that he had consulted such experts and his representations that all of the stock transactions for which I found investors and the stock transactions for which I purchased stock for my own account were "exempt" under or complied with state or federal securities laws.

28. In 2004, I heard Defendant Ross tell a group of prospective investors that he was a registered securities broker. This was in response to a question asked by one of the attendees at the meeting. *Since the filing of this motion, however, I checked the records of the Mississippi Secretary of State, who keeps a record of registered securities brokers in Mississippi that goes back past 2003* ***and discovered that Defendant Ross was not a registered securities "broker".***

29. Defendant Digital Ally's first shares of stock were issued pursuant to a Private Offering Memorandum, dated November 7, 2003 (Digital Ally was known as "TrophyCam, Inc." at that time). See selected pages from Digital Ally's "TrophyCam, Inc." Private Offering Memorandum dated November 7, 2003, a true and correct copy of which is attached as Exhibit #12 to Plaintiff's Response in Opposition to Defendants' First Motion For Summary Judgment. As the Private Offering Memorandum states that the shares may not be sold "except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Act":

> **The Shares are not being registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws and, unless so registered, may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Act and applicable state securities laws. Accordingly, the Shares are being offered and sold only to "Accredited Investors" (as defined in Rule 501(a) under the Act) that, prior to their purchase of the Shares, deliver to the Company a subscription agreement and investor questionnaire, which contain certain representations and agreements on resales or transfers.**

30. As this was explained to me, this was one of the reasons that I needed to "introduce" potential" investors to Defendant Ross, but leave the "selling" of stock – the actual solicitation of money, any negotiation – to Defendant Ross.

31. Attached as Exhibit #3 to my Response in Opposition to Defendants' Second Summary Judgment Motion is a copy of the "Investor Questionnaire" for "TROPHYCAM, INC." (Digital Ally's name at that time), which I completed on or about March 13, 2004. One the reasons Defendant Ross

told me that I needed to complete this "Investor Questionnaire" was in order to facilitate and/or maintain the "exempt" status of Digital Ally's stock transactions from state and federal securities laws.

32. I certainly would not have invested such large sums of money, much of it from loans, I had even suspected the stock transactions were not "exempt" and my agreements were illegal under state and/or federal securities laws or that I were was required to be "registered" as a securities broker.

33. The best examples of my role in raising capital for Defendant Digital Ally versus that of Defendant Ross can found in the deposition testimony of Paul Steven Board (a copy of which is attached as Exhibit #4 to Plaintiff's Response in Opposition to Defendants' Second Motion for Summary Judgment) and the deposition testimony of Larry Gene Ashley (a copy of which is attached as Exhibit #5 to Plaintiff's Response in Opposition to Defendants' Second Motion for Summary Judgment).

34. I have never been in the business of effecting or facilitating securities transactions.

35. I have never held myself out to public or advertized myself as a person in the securities brokerage business.

36. I have never received compensation for "arranging" securities transactions as a profession or on any kind of regular basis.

37. At that time Andy Ross asked me to be a consultant to Digital Ally, I was fifty-seven (57) years of age, but had other business interests I was pursuing as an entrepreneur and I wanted to leave all of my options open. From April 15, 2004, until July 7, 2004, I was employed again by Duluth Services on behalf of Delphi Automotive Systems on a temporary basis as a production control specialist and plant manager for their plant in Gadsden, Alabama, where I relocated during this temporary employment. Additionally, I was responsible for the start-up and became part owner in New South Homes, LLC and Homeseeker Quality Homes, LLC, modular home manufacturers that were developed during the Spring and Summer of 2005 while I was still a consultant for Digital Ally.

38. I received a Bachelors of Science degree from Penn State University in Industrial Engineering in 1968. I have also completed course work towards an MBA degree. I moved to Brookhaven, Mississippi in 1977 and was employed as an industrial engineer from March 1977 to October 1980 at a new plant start up for Delphi Automotive Systems, Packard Electric Division. From October 1980 until January 1983, I was General Supervisor Engineering at the Brookhaven plant. From January 1983 until August 1983, I was employed as a General Supervisor Manufacturing, where I supervised manufacturing activities in addition to my plant- wide engineering responsibilities. From February 1990 until

> September 1995, I was General Supervisor: Engineering. From September 1995 until June 2001, I was General Supervisor: Information Technologies, Production Control, Materials, and Customer Service. I retired from Delphi Automotive Systems in June 2001.

See DeHuff's Affidavit (#7, paragraphs 24-38). As stated previously, from April 15, 2004, until July 7, 2004, DeHuff was employed again by Duluth Services on behalf of Delphi Automotive Systems on a temporary basis as a production control specialist and plant manager for their plant in Gadsden, Alabama, where DeHuff **relocated** to Gadsden, Alabama. See paragraphs 15, 18 and 22 of Plaintiff's Affidavit attached as Exhibit #1 to Plaintiff's Response in Opposition to Defendants' *First* Motion for Summary Judgment.

Prior to the filing of Defendants' Second Motion for Summary Judgment, *Plaintiff used the term "solicited" as a layperson would use the term*, not as an attorney or someone experienced in the "business" of selling stocks would use that term. *As evidenced by DeHuff's answer to Defense counsel's initial questions, DeHuff is not even familiar with the language of a "securities" "broker"*:

Q. Have you ever engaged in business as a broker or a dealer in or of securities?
A. No.
Q. Have you ever had occasion to sell securities to private parties?
A. Not that I'm aware of.
Q. In other words, you've never sold shares of stock to, let's say, our good reporter here, or something like that?
MR. PIERCE: Object to the form of the question.
You can answer, if you understand.
A. Yes.
BY MR. DANIELS:
Q. You have? When?
A. I sold some personal stock to somebody.
Q. And who is that somebody?
A. It was several pieces -- people.
Q. Give me the name of each one of those several people.
A. I can't remember them all. My children.

Deposition testimony of DeHuff at Page 12:2 to 13:7 (Exhibit #2). Further testimony from DeHuff regarding his role as a "finder" includes the following:

Q. Okay. And how many of the investors that made up the million dollars as expressed in dollar amount had you brought into the deal yourself? When I say "brought into the deal," I mean had found and ultimately persuaded to buy Digital Ally stock.
A. I didn't persuade --
Q. So who persuaded?
A. -- none of them.

86

A. Andy.
Q. Andy persuaded all of them, and you persuaded none of them?
A. That's right.
Q. So the shares were then sold by Andy, I take it?
A. That's right.
Q. And you didn't sell any Digital Ally shares?
A. Not of the company's.
Q. And you didn't participate in the marketing of those Digital Ally shares?
A. Depends what you mean by "participating."
Q. Well, I mean, you didn't --
A. Did I introduce people to Andy? Yes.
Q. You didn't ask them to buy any stock, did you?
A. I might have said, "This is something you ought to look at."
Q. But you certainly didn't solicit and induce them to put their money into this stock, did you?
A. Andy did that.

See pages 85-86 of DeHuff's deposition (Exhibit #2). Also, see DeHuff's testimony:

A. Yes.
Q. But you didn't ask the people whom you asked -- whom you arranged to meet Andy Ross to buy anything, did you?
A. No, not specifically.
Q. How about non-specifically?
A. I don't think so.
Q. Okay. So all of the stock that was sold was sold by Andy Ross, correct?
A. Pretty much, far as I know.
Q. And you didn't do anything in connection with the sale, did you?
MR. PIERCE: Object to the form of the question.
A. I already answered. I did.
BY MR. DANIELS:
Q. What did you do?
A. I introduced them.
Q. You didn't expect to be paid for an introduction, did you?

A. Oh, come on. What do you mean? Yes, there was an agreement that he would pay me 10 percent for everything I helped arrange. That's very clear.
Q. Oh, okay. So you were supposed to be

89

. . .

Q. Okay. So, in fact, you did participate in the sales to that degree, right?
A. To that degree.
Q. Okay. In other words, you found the prospects for Andy Ross; is that right?
A. That's -- that's a good way to put it.
Q. Okay. And in exchange for finding the prospects, you were going to be paid 10 percent; is that right?
A. Yes.
Q. Okay.
A. 10 percent in stock.

See pages 88-89 of DeHuff's deposition (Exhibit #2).

***DeHuff's testimony regarding his actions as a "finder" is consistent with the deposition testimony of Defendant Andy Ross, who clearly testified DeHuff's role was that of making "introductions" or a that of a "finder":***

28

Q. (By Mr. Pierce) Mr. Ross, I'm showing you a copy of a document that was produced to us by your attorneys, and it's a -- it looks like a Quicken printout of payments paid to Mr. DeHuff over a period starting January 27th, 2004, and ending July 29th, 2005, and the notations on there say, "For consulting." Would you tell me what those payments to Mr. DeHuff were for?
**A. Well, as mentioned, Tom was instrumental in helping me raise some money and putting people together and organizing meetings for me down in his area.**
Q. Down in Mississippi?
A. Correct.

. . .

32

Q. What were Mr. DeHuff's duties as a consultant to

Digital Ally?

MR. GORMAN: Same objection.

**A. His primary duty was to help me introduce me to**

. . .

33

**people and set up meetings for me and take care of organizing events in Mississippi for me to raise money and communicate with shareholders**.

**Q. (By Mr. Pierce) When you say introduce you to people, introduce you to potential investors?**

**A. Correct.**

**Q. In the Brookhaven area or anywhere?**

**A. Well, wherever, but, I mean, if he knew someone in New York, that would have been fine, too, but obviously the majority of the people he knew were in his area.**

**Q. So primarily his duties were in Mississippi, correct?**

**A. Yes, by his own circle of influence of friends.**

Q. How well did Mr. DeHuff perform his duties as a consultant?

MR. GORMAN: Same objection.

**A. You know, Tom definitely introduced me to some people and those people tended to introduce me to people, and things could get a little unorganized from time to time, but Tom did introduce me to people.**

78

Q. Over the course of your career as president and chief executive officer of Digital Ally, approximately how many trips to Mississippi do you think you made?

A. Just for Digital Ally? Four to six.

Deposition testimony of Defendant Ross at Pages 28-33, and 78 (Exhibit #2) (emphasis added).

Even many distinguished jurists have struggled answering such a fact-specific question as what constitutes "engaged in the business" under our state and federal securities laws, especially in the context of stock issued by "private placements", such as is the situation the Court is faced with in this case. One Court recently observed:

> The court notes that both parties appear to have been operating in the area of private-placement-broker-dealers that has been referred to as a "vast gray market of securities brokerage."See ABA Section of Business Law, Report and Recommendation of the Task Force on Private Placement Broker-Dealers, 60 Bus. Law. 959, 960 (May 2005) (noting the "major disconnect between the various laws and regulations applicable to securities brokerage activities and the methods and practices actually in daily use by which the vast majority of capital is raised to fund early stage businesses in the United States") (hereinafter, "ABA Report"). Although legislation on the horizon may ameliorate the situation, the fact remains that, "[n]otwithstanding the various labels, and despite the fact that a great number of the brokers, funded businesses, and even sometimes their attorneys, do not realize that they are operating in violation of securities laws; simply put, they are unlicensed securities brokers whose fee contracts are unenforceable and whose activities are, in fact, illegal." *Id.*; see also Final Report of the Advisory Committee on Smaller Public Companies to the U.S. Securities and Exchange Commission, April 23, 2006, available at http:// www.sec.gov (advocating a cost-effective scheme of registration and regulation). **The present system includes private placement broker-dealers who, although operating on the edge of legality, adhere to honest and ethical business practices, as well as those who could be characterized as charlatans or dishonest, unethical brokers**. See ABA Report at 961. ***Distinguishing these parties' place on that continuum of behavior is relevant to the court's equitable determination***.

*Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, *11 (D.Neb2006) (emphasis added).

While the Court may not be in a position to rule for DeHuff on this issue, there can be no doubt that, *at the very least*, there are of genuine issues of material fact on the issue of whether DeHuff's primary role was that of a "finder" rather than a "broker" – that preclude summary judgment. In a motion for summary judgment, the Court is not permitted to weigh evidence, the Court must deny the Defendants' Second Motion for Summary Judgment and allow the finder of fact later to sift the evidence to determine the extent of DeHuff's participation in the transactions and whether his status was that of a broker or a finder. *Compare, Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, Fed. Sec. L. Rep. P 93, 974 (D.Neb.2006).

III. **Alternatively, genuine issues of material fact exist with regard to whether DeHuff can prevail on any equitable defenses of estoppel and *in pari delicto* to a §29(b) claim for rescission.**

Even if Defendants could make out a prima facie case under section 29(b), the Court must still determine whether DeHuff has an "equitable defenses"; the equitable defenses of estoppel, and *in pari delicto* are available in opposition to a section 29(b) claim for rescission. *Regional Properties, Inc. v. Financial & Real Estate Consulting Co*., 678 F.2d 552, 562-63 (5th Cir.1982).

**a. Estoppel.**

The equitable defense of "estoppel" is available to DeHuff in opposition against the Defendant's use of section 29(b) action for rescission. *Regional Properties, Inc. v. Financial* & Real Estate Consulting Co., 678 F.2d 552, 562-63 (5th Cir.1982). Although Federal law governs questions involving the interpretation of a federal statute, equitable determinations are governed by the law of the forum. *Regional Properties, Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552, 562-63 (5th Cir.1982).

Under Mississippi law:

> It is axiomatic that estoppel forbids one from both gaining a benefit under a contract and then avoiding the obligations of that same contract. "A party cannot claim benefits under a transaction or instrument and at the same time repudiate its obligations." *Wood Naval Stores Export Assn. v. Gulf Naval Stores Co*., 220 Miss. 652, 664, 71 So.2d 425, 430 (1954). This doctrine, termed "quasi-estoppel," "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position [it has] previously taken," and "applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit." *Bott v. J.F. Shea Co., Inc*., 299 F.3d 508, 512 (5th Cir.2002). This is exactly the situation at hand; the Baileys cannot profit under this contract and also seek to have it declared invalid where their obligations under the contract are concerned.

*Bailey v. Kemp*, 955 So.2d 777, 782 (Miss.2007). This is exactly the situation in the case at bar: Defendants seek to invalidate a contract after they have already received all of the benefits under the agreements upon which it was based. As DeHuff stated:

> 5 As I explained in my prior Affidavit attached as Exhibit # 1 to Plaintiff's Response in Opposition to Defendant's First Motion for Summary Judgment, as of April 1, 2005, I had paid all of the money I had agreed to pay and otherwise, performed all of my duties under all of my agreements with Defendant Ross and Defendant Digital Ally. Defendants, however, had not fulfilled all of their duties to me.

See paragraph #5 of DeHuff's Affidavit (Exhibit #7). Even Defendant Ross admitted DeHuff had an agreement with Defendant Digital Ally:

44

Q. (By Mr. Pierce) What about agreements for
commissions for raising capital, investment capital
in Digital Ally, isn't it true that you agreed he
would receive a 10 percent commission for --
A. A what commission?
Q. 10 percent commission for money he helped raise in
Digital Ally?
A**. We agreed he would get a commission for money**
**raised, for helping raise money as part of his**

**45**

**employment, his whole package, and he did get**
**significant stock, my numbers show more than 10**
**percent,** but, you know, TrophyTech and Digital Ally

Defendant Ross' deposition at pages 44-45 (Exhibit #1). ***Defendants should be stopped from attempting to invalidate the April 8, 2005 Agreement after having already received the full benefit from the <u>prior agreements with DeHuff</u>***; such would produce an inequitable result. This is especially true in light of the fact that:

> 26. Before I began introducing potential investors to Defendant Ross, Defendant Ross assured me that he, the President, Chief Executive Officer, Treasurer and the <u>only</u> officer and only director of Defendant Digital Ally had and

was consulting with experienced securities law attorneys and other persons with expertise in federal and state securities law and Defendant Ross assured me that all of the stock transactions that involved investors that I introduced Defendant Ross to <u>and</u> the stock transactions for which I purchased stock for my own account were "exempt" under or complied with state and federal securities laws.

27. Although I have experience as an business entrepreneur and management experience, I am not experienced with what circumstances call from private individuals such as myself to be registered as "brokers" of securities under state or federal securities laws, nor was I familiar with the legal consequences of failing to register as a "broker" of securities under state and/or federal securities laws.

28. Furthermore, I did not believe I was acting as a "broker" of securities in these transactions at the time. I still do not think I was acting as a "broker".

29. Throughout my dealings with the Defendants, I believed Defendant Ross was consulting experienced securities law attorneys and other persons with expertise in federal and state securities law regarding our agreements for stock of Digital Ally and I relied on Defendant Ross' representations that he had consulted such experts and his representations that all of the stock transactions for which I found investors and the stock transactions for which I purchased stock for my own account were "exempt" under or complied with state or federal securities laws.

30. <u>In 2004, I heard Defendant Ross tell a group of prospective investors that he was a registered securities broker</u>. This was in response to a question asked by one of the attendees at the meeting. Since the filing of this motion, however, I checked the records of the Mississippi Secretary of State, who keeps a record of registered securities brokers in Mississippi that goes back past 2003 and discovered that <u>**Defendant Ross was not a registered securities "broker".**</u>

31. Defendant Digital Ally's first shares of stock were issued pursuant to a Private Offering Memorandum, dated November 7, 2003 (Digital Ally was known as "TrophyCam, Inc." at that time). See selected pages from Digital Ally's "TrophyCam, Inc." Private Offering Memorandum dated November 7, 2003, a true and correct copy of which is attached as Exhibit #12 to Plaintiff's Response in Opposition to Defendants' First Motion For Summary Judgment. As the Private Offering Memorandum states that the shares may not be sold "except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Act":

**The Shares are not being registered under the Securities Act of 1933, as amended (the "Act") or any state securities laws and, unless so registered, may not be offered or sold except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the Act and applicable state securities laws. Accordingly, the Shares are being offered and sold only to "Accredited Investors" (as defined in Rule 501(a) under the Act) that, prior to their purchase of the Shares, deliver to the Company a subscription agreement and investor questionnaire, which contain certain representations and agreements on resales or transfers.**

32. As this was explained to me, this was one of the reasons that I needed to "introduce" potential" investors to Defendant Ross, but leave the "selling" of stock – the actual solicitation of money, any negotiation – to Defendant Ross.

33. Attached as Exhibit #3 to my Response in Opposition to Defendants' Second Summary Judgment Motion is a copy of the "Investor Questionnaire" for "TROPHYCAM, INC." (Digital Ally's name at that time), which I completed on or about March 13, 2004. One the reasons Defendant Ross told me that I needed to complete this "Investor Questionnaire" was in order to facilitate and/or maintain the "exempt" status of Digital Ally's stock transactions from state and federal securities laws.

34. I certainly would not have invested such large sums of money, much of it from loans, I had even suspected the stock transactions were not "exempt" and my agreements were illegal under state and/or federal securities laws or that I were was required to be "registered" as a securities broker.

See DeHuff's Affidavit (Exhibit #7).

Under the facts in this case, ***Defendants should be stopped to invalidate a contract after they have already received all of the benefits under the prior agreements with DeHuff upon which the April 8, 2005 was based.*** *Bailey v. Kemp*, 955 So.2d 777, 782 (Miss.2007).

b. ***In Pari Delicto.***

The United States Supreme Court has held that the in pari delicto defense may operate as a bar to private causes of action for damages under the federal securities laws. *Bateman Eichler, Hill Richards, Inc. v. Berner*, 472 U.S. 299, 105 S.Ct. 2622, 86 L.Ed.2d

215 (1985). The Court held that an action "may be barred on the grounds of the plaintiff's own culpability only where (1) as a direct result of his own actions, the plaintiff bears at least substantially equal responsibility for the violations he seeks to redress, and (2) preclusion of suit would not significantly interfere with the effective enforcement of the securities laws and protection of the investing public." *Id*. at 310-11, 105 S.Ct. at 2629.

Defendants' attempted use of the doctrine of *in pari delicto* is misplaced. The equitable defense of *in pari delicto* is available to DeHuff in *opposition* against the Defendant's use of section 29(b) action for rescission. See *Regional Properties, Inc. v. Financial & Real Estate Consulting Co*., 678 F.2d 552, 562-63 (5th Cir.1982). In the present case, ***DeHuff recently discovered that Defendant Ross was also not a registered "broker", despite his representations to investors that he was a registered broker***. See DeHuff's Affidavit at paragraph #30 (Exhibit #7). If DeHuff's conduct was illegal, Defendants were obviously engaged in illegal conduct that was of much grander scale than DeHuff's conduct. Consequently, the Court must apply the fact-intensive test announced by the United Supreme Court in *Bateman Eichler, et al., Inc. v. Berner*, 472 U.S. 299, 306, 105 S.Ct. 2622, 86 L.Ed.2d 215 (1985) to examine each party's conduct.

Thus, "in deciding how to fashion a remedy in the area of illegal bargains, the type and degree of illegality become high important factors." Compare, *Occidental Life Ins. Co. v. Pat Ryan & Associates, Inc.*, 496 F.2d 1255, 1266 (4th Cir.1974). ***'[T]here is a conspicuous lack of judicial enthusiasm' for rescission when there has been performance by the violator."*** *Occidental*, 496 F.2d at 1266.

In rendering its decision in *Bateman Eichler,* the United States Supreme Court concluded: "Given the record in this case, we cannot ascertain whether Pinter may

successfully assert an *in pari delicto* defense. . ." Likewise, while the Court may not be in a position to rule for DeHuff on this issue, there can be no doubt that, *at the very least*, there are of genuine issues of material fact on the issue of whether DeHuff may successful assert an *in pari delicto* defense to the Defendants' claim for rescission under Section 29(b), that preclude summary judgment.

In a motion for summary judgment, the Court is not permitted to weigh evidence, so it must now deny the Defendants' Second Motion for Summary Judgment. *Compare*, *Cornhusker Energy Lexington, LLC v. Prospect Street Ventures*, 2006 WL 2620985, Fed. Sec. L. Rep. P 93, 974 (D.Neb.2006). Indeed, such questions are most often properly reserved for the jury upon proper instruction. *Banc One Capital Partners Corp. v. Kneipper*, 67 F.3d 1187 (5th Cir.1995) (trial court's erroneous jury instruction on materiality in securities fraud action would require reversal of jury's finding that two investors were in pari delicto with defendant seller of securities; seller's defense of in pari delicto required that jury be properly instructed on scope of underlying illegal actions being alleged before it could determine whether two investors bore at least substantially equal responsibility for illegal actions, or whether investors could prove securities fraud without also having to prove their own illegal acts.)

## ***CONCLUSION***

As explained herein and Plaintiff's Response in Opposition to Defendant's Second Motion for Summary Judgment, and supported by the attached exhibits, Section 29(b) of the Exchange Act cannot be used to void the April 8, 2005 Agreement because the April 8, 2005 Agreement does not involve a "prohibited transaction". Alternatively, when the evidence in this case is viewed the light most favorable to DeHuff, the nonmoving party, it supports only one

conclusion: (a) there are genuine issues of material fact exist regarding whether DeHuff was acting as a "finder" or whether DeHuff was acting as a "broker" and was required to registered under the Act, and (b) there are genuine issues of material fact regarding whether DeHuff can prevail on any equitable defenses to a §29(b) claim for rescission. Therefore, Defendants' Second Motion for Summary Judgment must be denied.

This the 20th day of July, 2009.

Respectfully submitted,

THOMAS H. DEHUFF

HENRY, BARBOUR, DECELL &
BRIDGFORTH, PLLC

s/ Ronald Henry Pierce
RONALD HENRY PIERCE, Bar #8510
Email: ronnpierce@gmail.com
E. BARRY BRIDGFORTH, Bar #8656
Email: barrylaw@bellsouth.net
117 East Jefferson Street
Yazoo City, Mississippi 39194
(662) 746-2134
FAX: 662-746-2167

**CERTIFICATE OF SERVICE**

I, RONALD HENRY PIERCE, do hereby certify that I have on this date caused to be served by electronic transmission, a true and correct copy of the above and foregoing.

CHARLES F. F. BARBOUR, Esq.
One Jackson Place, Suite 1400
188 East Capitol Street
Jackson, Mississippi 39201
"Charles Barbour" @ cbarbour@blswlaw.com

ALAN J. MISLER, Esq.
Mc Dowell, Rice, Smith & Buchanan
605 West 47th Street, Suite 350
Kansas City, Missouri 64112

"Alan J. Misler" @ jmisler@mcdowellrice.com

ATTORNEYS FOR DEFENDANTS

A true and correct copy of the above and foregoing was also served by U.S. mail, postage prepaid to the following:

B. Clint Gardner
THE GARDNER GROUP, P.A.
P.O. Box 1163
Brookhaven, MS 39601-1163

This the 20th day of July, 2009.

s/ Ronald Henry Pierce