IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
JACKSON DIVISION

| | | |
|---|---|---|
| THOMAS H. DEHUFF, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:08cv327TSL-JCS |
| | ) | |
| DIGITAL ALLY, INC. and CHARLES A. ROSS, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED REPLY MEMORANDUM IN SUPPORT OF DEFENDANTS DIGITAL ALLY, INC. AND CHARLES A. ROSS'S SECOND MOTION FOR SUMMARY JUDGMENT UNDER FED. R. CIV. P. 56**

Marcus M. Wilson, MS Bar #7308
BENNETT LOTTERHOS SULSER & WILSON
One Jackson Place, Suite 1400
188 E. Capitol Drive
Jackson, MS 39205
(601) 944-0466 telephone
(601) 944-0467 telecopier

James F.B. Daniels, MO Bar #30003
A. Jeffrey Misler, MO Bar #37383
McDOWELL RICE SMITH & BUCHANAN
605 W. 47th Street, Suite 350
Kansas City, MO 64112
(816) 753-5400 telephone
(816) 753-9996 telecopier

ATTORNEYS FOR DEFENDANTS

**TABLE OF CONTENTS**

INTRODUCTION AND SUMMARY OF REPLY ARGUMENT ............................................... 1

I. RELATIVE BURDENS OF THE PARTIES IN THE CONTEXT OF SUMMARY JUDGMENT ........................................................................... 1

II. SUMMARY OF DEHUFF'S RESPONSE TO THE SECOND MOTION ............ 2

III. SUMMARY OF DIGITAL'S REPLY ARGUMENT ........................................... 4

STATEMENT OF UNCONTROVERTED FACTS ........................................................ 7

REPLY ARGUMENT ........................................................................................................ 14

I. BY "FINDING" PURCHASERS OF DIGITAL STOCK, BY "INTRODUCING" THOSE PURCHASERS TO DIGITAL/ANDY ROSS AND BY RECOMMENDING DIGITAL AS AN "INVESTMENT" THAT THESE INVESTORS SHOULD "TAKE A LOOK AT", DEHUFF HAS ENGAGED IN THE BUSINESS OF "EFFECTING TRANSACTIONS IN" DIGITAL STOCK, AND DEHUFF HAS OTHERWISE FAILED TO SATISFY HIS BURDEN OF DEMONSTRATING THAT THESE ACTIVITIES NOTWITHSTANDING, HE WAS SOMEHOW EXEMPT FROM REGISTRATION AS A BROKER/DEALER ............................................................................ 14

II. THE 150,000 SHARE "CONTRACT" WHICH DEHUFF WOULD HAVE THIS COURT ENFORCE IS SQUARELY WITHIN THE NULLIFICATION PROVISIONS OF § 29(B) FOR THE REASON THAT IT PROVIDES FOR THE PAYMENT OF UNLAWFUL COMPENSATION TO AN UNREGISTERED BROKER IN EXCHANGE FOR ILLEGAL SERVICES ..... 17

III. DEHUFF'S PURPORTED CONTRACT FOR AN ADDITIONAL 150,000 DIGITAL SHARES IN COMPENSATION FOR HIS "SERVICES" IS VOID BY OPERATION OF § 29(B), WITHOUT REGARD TO THE DOCTRINES OF *IN PARI DELICTO*, ESTOPPEL OR ANY OTHER EQUITABLE DEFENSE AND OTHERWISE AS A RESULT OF DEHUFF'S FAILURE TO SUSTAIN HIS OWN BURDEN UNDER MISSISSIPPI LAW TO PROVE THAT THE CONTRACT IS VALID AND FOR LAWFUL PURPOSES ............................... 20

# TABLE OF AUTHORITIES

## Cases

Bateman Eichler Hill Richards, Inc. v. Burner, 472 U.S. 299, 306, 105 S. Ct. 2622, 86 L.Ed.2d 215 (1985) ........ 22

Couldocks & Bohan, Inc. v. Societe Generale Securities Corp., 93 F.Supp.2d 220, 231 (D. Conn. 2000) ........ 20

Estate of Reaves v. Owen, 744 So.2d 799, 801 (Miss. App. 1999) ........ 21

Gilligan Will & Co. v. SEC, 267 F.2d 461, 466 (2nd Cir. 1959) ........ 16

Lawrence v. Richman Group Capital Corp., 358 F.Supp.2d 29, 36 (D. Conn. 2005) ........ 16, 22

Regional Properties, Inc. v. Financial and Real Estate Consulting Co., 678 F.2d 552, 557 (5th Cir. 1982) ........ 17, 22, 23

Roth v. SEC, 22 F.3d 1108, 1109 (D. C. Cir. 1994) ........ 16

SEC v. Culpepper, 270 F.2d 241, 246 (2nd Cir. 1959) ........ 16

SEC v. Deyon, 977 F. Supp. 510, 518 (D. Me. 1997) ........ 15

SEC v. George, 426 F.3d 786, 797 (6th Cir. 2005) ........ 15

SEC v. Kenton Capital, Ltd., 69 F.Supp.2d 1, 13 (D. D.C. 1998) ........ 15

SEC v. Ralston Purina Co., 346 U.S. 119, 73 S. Ct. 981, 97 L.Ed. 1494 (1953) ........ 16

SEC v. The American Foundation for Advanced Education of Arkansas, 222 F. Supp. 828, 830-31 (W. D. La. 1963) ........ 16

Smith v. Simon, 224 So.2d 565, 566 (Miss. Sup. 1969) ........ 21

Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 17, 100 S. Ct. 242, 62 L.Ed.2d 146 (1979) ........ 18

Warwick v. Matheney, 603 So.2d 330, 336 (Miss. Sup. 1992) ........ 21

Wesbanco Bank Barnesville v. Rafoth, 106 F.3d 1255, 1260 (6th Cir. 1977) ........ 15

## Other Authorities

§ 29(b) of the Securities Exchange Act of 1934 ........ 1, 3, 5, 6, 17, 18, 20, 21, 22, 23

Investment Advisors Act ........ 18

## Rules

17 C.F.R. § 240.3a4-1 ........ 17

Fed. R. Civ. P. 56 ........ 4

SEC Rule 3a4-1 ........ 17

**Codes**

15 U.S.C. § 10 ..... 18
15 U.S.C. § 78 ..... 1, 3, 14, 15, 17
Miss. Code Ann. § 75-71-727 ..... 1, 6
Miss. Code Ann. Chapter 75 ..... 3
Miss. Code Ann. Stat. § 75-71-301 ..... 17

COME NOW defendants Digital Ally, Inc. ("Digital") and Charles A. Ross, Jr. ("Andy Ross") and for their Reply Memorandum in Support of their Second Motion for Summary Judgment ("Second Motion") upon each of the claims for relief asserted against them by plaintiff Thomas H. DeHuff ("DeHuff") would respectfully suggest to the Court the following points and authorities.

## INTRODUCTION AND SUMMARY OF REPLY ARGUMENT

### I. RELATIVE BURDENS OF THE PARTIES IN THE CONTEXT OF SUMMARY JUDGMENT

As the Court knows, summary judgment is essentially a two (2) step process. First, the Court identifies the "legal" grounds which, according to the movant, entitle it to summary judgment, and after determining whether those grounds are "legally sufficient" for that purpose, the Court identifies each of the facts material to those grounds, about which there must be no genuine dispute. Second, the Court examines the facts as adduced, initially, by the movant and then, in opposition, by the non-moving party, to determine whether, with respect to the facts that it has identified as "material", there is or is not any "genuine" issue.

In this case, Digital and Andy Ross have moved for summary judgment upon a single ground: that DeHuff is not a "registered" broker of securities and accordingly, that the purported "contract" under which he seeks to recover additional compensation for his services in "effecting the sale" of Digital stock to "investors" is void under § 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78cc(b) and Miss. Code Ann. § 75-71-727. As DeHuff himself appears to recognize, there is, from a "legal" perspective, nothing difficult or unsettled about that ground. Nor is it a ground that requires the Court to consider complex facts, or to determine whether multiple "elements" of claims have been or can be established, or whether there is or will be proof of such typically subjective matters as intent, *scienter*, or state-of-mind.

Digital and Andy have moved for summary judgment on the ground that by statutory mandate, the contract which DeHuff seeks to enforce is simply void. That is the single ground for summary judgment identified in the Second Motion and the single ground to which all of the facts adduced in that Motion relate. It is the single ground that DeHuff should have addressed in his Response and it is the single ground to which his legal arguments and his controverting facts, if any, should themselves have related.

## II. SUMMARY OF DEHUFF'S RESPONSE TO THE SECOND MOTION

Given the simplicity of the factual as well as legal issues, DeHuff recognizes that if he responds to the Second Motion, on the merits, as presented, he will surely lose. Therefore, DeHuff does what most litigants do in that situation. He replaces the "real" issues, those which he inevitably will lose, with "phantom" issues which, conceivably, he could win. To do that, DeHuff recasts entire litigation. He "takes" a case wherein he, as plaintiff, has asserted claims for breach and/or specific performance of a purported contract and essentially reverses the roles of the parties.

In the version of reality that appears in his response, DeHuff would have the Court believe that it is in fact Digital and Andy who have sued him, claiming "rescission" of the purported contract and, as the equitable remedy that accompanies rescission, seeking "restitution" of the 735,000 shares of Digital stock that DeHuff has already received in exchange for his illegal services. Under this fictional scenario, it is DeHuff who is entitled to raise affirmative, indeed "equitable" defenses, and his selection of the "*in pari delicto*" defense is a natural choice.

In his Response, DeHuff tells the Court two (2) things, each of which is intended not only to excuse him from serious violations of the security laws, but to allow him to be compensated

for conduct which, had it been discovered, could have landed him and perhaps others in jail. First, DeHuff argues that although § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b) provides that "**[e]very contract made in violation of any provision of**" the Act, "**and every contract, the performance of which involves a violation of, or the continuance of any relationship or practice in violation of**" the Act, "**shall be void … as regards to the rights of any person who, in violation of any such provision … shall have made or engaged in the performance of any such contract**", the contract that he allegedly made with Digital does not involve a "transaction prohibited" under the Exchange Act or, for that matter, the Mississippi Securities Act, Miss. Code Ann. Chapter 75. As DeHuff would "spin" it, the purported contract wherein Digital is supposed to have promised DeHuff an additional 150,000 shares of its post-merger/post-split common stock in exchange for his services in "finding" buyers for Digital stock, does not involve a "prohibited transaction", whether because "finding" and/or "introducing" investors to an issuer of stock does not constitute "effecting the sale" of securities, or because those violations are obviously complete, and "paying" DeHuff, now, for his past, if illegal services will not produce any new or further "violation" of the securities laws.

Second, DeHuff contends that Digital and Andy's "claim for rescission" of the purported 150,000 share agreement and, presumably, for "restitution" of whatever they have paid to DeHuff heretofore is, after all, a claim "sounding in equity" and, like any other, is subject to DeHuff's "equitable defenses". DeHuff identifies these "equitable defenses" as "**estoppel**" and "***pari delicto***". Estoppel, according to DeHuff, arises from the fact that Digital/Andy have already "paid" DeHuff at least 600,000 shares of stock for his arguably illegal "services" and, therefore, are in no position to quibble about giving him 150,000 shares more. In turn, the *pari delicto* defense springs from the contention that if DeHuff's activities in "effecting the sale" of

Digital shares to investors truly were "illegal", Digital and/or Andy were, in effect, his "partners in crime" and their own wrongdoing prevents them from "rescinding" DeHuff's otherwise illegal contract for additional "commissions".

## III. SUMMARY OF DIGITAL'S REPLY ARGUMENT

Digital and Andy will dispose of DeHuff's contentions as briefly as possible. As contemplated under Fed. R. Civ. P. 56, Digital will begin with a restatement of those material facts which, as demonstrated in DeHuff's own Response are now truly uncontroverted. As Digital will show, the additional 150,000 shares of stock which DeHuff hopes to recover from Digital are, by DeHuff's own admission, compensation for his services in "finding" investors and "effecting the sale" to those investors of Digital stock. As the Court will see, DeHuff's activities in "selling securities" were not "casual" or "one-time-only" or the product of "happenstance". On the contrary, given DeHuff's admissions that he "effected the sale" of sufficient numbers of Digital shares to investors to earn a 10% commission equal to least 600,000 Digital shares, and that he had earlier been "compensated" for finding some 22 investors in another Andy Ross "start-up company" called "ICOP Digital, Inc.", the sale of securities was for DeHuff a regularly conducted business activity in which DeHuff engaged for substantial profit. Notwithstanding his admission that he at no time held a securities license, whether of the state of Mississippi or as issued by instrumentalities of the United States, DeHuff acknowledges that he was engaged to find investors in and did find investors in ICOP and that he was engaged to find investors in and did find investors in Digital. DeHuff admits (1) that he identified potential investors; (2) that he contacted potential investors using instrumentalities of commerce; (3) that he "introduced" those investors, as "found", to Andy Ross; (4) that he participated in "meetings" wherein shares of Digital stock were "marketed" to the investors he

had "found"; (5) that he recommended Digital stock to these investors as something "they should look at"; and (6) that the "raising of capital" and "shareholder relations" were two of the important things for which he had allegedly been hired by Digital as a "consultant".

Having reviewed these, the now indisputable facts, Digital and Andy will turn to "the law". Digital and Andy will make three (3) essential points. First, they will show, beyond any meaningful dispute, that as an admitted "finder" and/or "introducer" of investors, DeHuff fits squarely within the definition of a person involved in "effecting the sale" of securities and, accordingly, that the 150,000 share "commission" contract that he hopes to enforce is a "prohibited transaction" for purposes of § 29(b). As Digital and Andy will demonstrate, all that is required to show that DeHuff was "engaged in the business of effecting transactions in securities for the account of others" and thus acted as an unlicensed broker, is proof that DeHuff participated in securities transactions, that he was paid by commission as opposed to salary, that he had a history of selling the securities of other issuers, that he was involved in advising investors, and that he "actively recruited" investors. As the Court will see, DeHuff admits all of these things. Similarly, Digital and Andy will show that contracts which § 29(b) renders void and enforceable are not limited to contracts between issuers and sellers or contracts which necessarily involve a violation of securities laws in their making or performance. Digital and Andy Ross will show that § 29(b) applies to all contracts, the performance of which involves the violation of securities laws, whether because the contract was illegal when made, or because it is or will be illegal as performed, or because it continues a relationship or practice that is or was illegal.

Second, Digital and Andy will show that neither the doctrine of "***in pari delicto***", "**estoppel**" nor any other "equitable defense" has any application in this case. § 29(b) of the

Exchange Act and its Mississippi counterpart, Miss. Ann. Code Stat. § 75-71-727 are by their terms defensive. By operation of law, they prohibit the enforcement of any contract violative of the securities laws by any person claiming benefit under that contract. They are statutes of "strict liability", and DeHuff has identified no case, ruling, administrative interpretation or authority wherein any defense to the enforcement of such a contract has been mitigated, modified or made subject to any "equitable" doctrine, whatever.

Third and finally, Digital and Andy will show that where the Courts, particularly in this Circuit, have applied the doctrine of "*in pari delicto*" in the context of actions involving § 29(b), it has been to only a very narrow class of § 29(b) actions. As Digital and Andy will show, "*pari delicto*" can or has been raised as an "affirmative defense" in equitable actions to rescind contracts that are voidable under § 29(b) wherein restitution is sought of whatever has been paid or given to the defending party pursuant to that voidable contract. It is only in the context of these special, judicially-created actions for rescission and restitution that the relative "blameworthiness" of the rescinding party can and may be considered and only then for purposes of determining whether it is "equitable" to command the other party to restore what he or she has already received under the contract. That is the only context recognized in the case law in which the doctrine of "*in pari delicto*" arises and however much DeHuff might wish it were so, it is not the context in which § 29(b) is relevant here.

In summary, Digital and DeHuff will show, based upon DeHuff's own admissions, that there is no genuine dispute as to the material fact that DeHuff was engaged in the business of "effecting the sale of securities". Since he was so engaged, notwithstanding the fact that he held no securities license, the contract whereby he seeks an additional 150,000 shares of Digital stock is a contract relating to services, the rendition of which was prohibited absolutely under the

securities laws. It is a contract which, as a matter of law, is void and unenforceable and it is a contract upon which Digital and Andy are entitled to summary judgment.

**STATEMENT OF UNCONTROVERTED FACTS**

As DeHuff has been heard to complain, Digital's Second Motion contains 121 statements of material fact, each supported by citation to the affidavits, depositions and exhibits contained in the accompanying Appendix. DeHuff has responded to each of those paragraphs and to each of the statements of facts therein appearing. Although Digital and Andy object, for the record, to the conclusory and unsupported statements appearing in the affidavit which is DeHuff's principal support for his response; to his serial impeachment of his own deposition testimony and to his unexplained and unsupported refusal to admit propositions of fact extracted directly from that testimony, they make no issue of those deficiencies at this time. Instead, they will focus upon the unalloyed admissions that do appear in DeHuff's response, including his admission that much of his testimony and/or the testimony of other material witnesses, "speaks for itself". Those admissions are as follows, accompanied by citations to the precise paragraph of/in DeHuff's Response in which they can be found.

1. Digital is engaged in the development, manufacture and sale of digital recording devices and related equipment, the principal consumers of which are law-enforcement agencies, branches of the Armed Forces of the United States, and other public as well as private security organizations (DeHuff Response, ¶ 11).

2. Digital is the product of a merger on December 9, 2004 of Vegas Petra, Inc., a public Nevada corporation, and "Trophy Tech, Inc.", a private Nevada corporation, organized on or about May 16, 2003, formerly known as "TrophyCam, Inc." In the context of that merger, Vegas Petra was the "surviving" corporation and was renamed "Digital Ally, Inc.", *Id* at ¶ 12.

3. Andy Ross, Jr., known generally as "Andy" Ross organized "Trophy Tech" on or about May 16, 2003 and was the sole officer and director of Trophy Tech from September, 2003 until December, 2004, *Id* at ¶ 13.

4. Andy Ross ceased to be an officer and director of Digital in February, 2006 and is no longer a shareholder of Digital, *Id*. at ¶ 17.

5. In 2003, Andy Ross and/or Andy Ross and his spouse, Angela Ross, were also shareholders in a company called ICOP Digital, Inc. ("ICOP"). ICOP was and is a producer and marketer of mobile and stationery surveillance equipment sold to "first responders" in the law enforcement/security industry, *Id* at ¶ 18.

6. DeHuff admits that Digital is a competitor of ICOP, *Id* at ¶ 20.

7. DeHuff admits in the affidavit dated January 19, 2009 which was attached as **EXHIBIT 1** to his Response in Opposition to Digital and Andy's First Motion for Summary Judgment and upon which he continues to rely in his Response to the Second Motion, *see*, DeHuff's response, ¶¶ 9, 21, 57, 71, 73, 76, 79, 80, 90, 103, 116, 117, 118, that he and Andy Ross "agreed that if" DeHuff "assisted him [to] locate investors for ICOP, he would reward me with ICOP stock", DeHuff affidavit dated 1/19/09, ¶ 4.

8. DeHuff admits that he has never held a securities license, whether issued by the United States or by any state of the United States and, indeed, that he has never applied for any securities license, *Id* at ¶ 76.

9. DeHuff admits that he helped "introduce people" to Andy Ross for the purpose of investing" in ICOP; that he introduced "maybe 25 people", and that in consideration of his efforts, ICOP management arranged for him "to buy some shares from a former employee of the

company … at less than full price" and that DeHuff "felt amply rewarded" for his efforts, *Id* at ¶ 28.

10. DeHuff admits that he heard of Trophy Tech, the predecessor to/of Digital Ally on September 10, 2003. DeHuff admits that on or about September 10, 2003, Andy Ross told DeHuff, for the first time, about a new company that Andy had formed "to make a video recording system that would film an arrow being shot a deer or other target", *Id* at ¶ 66.

11. DeHuff admits that Andy Ross asked him if he could "raise money" for the new company, *Id* at ¶ 67.

12. DeHuff admits that he told Andy Ross that if DeHuff did help "raise money for this new company, Andy would have to make provisions to reward" DeHuff, *Id* at ¶ 68.

13. DeHuff admits that Andy Ross "agreed" that "new company would reward" DeHuff "with stock valued at 10% of what" DeHuff "raised", *Id* at ¶ 69.

14. DeHuff admits that after "consideration of the proposal", he "agreed to help raise money" for the new company "which in time was renamed" Digital Ally in exchange for Andy Ross' agreement that the new company would issue" stock to DeHuff "in an amount equal to ten percent (10%) of the capital" that DeHuff "helped raise", *Id* at ¶ 70.

15. DeHuff admits that he "did not want to be an 'employee' of Digital Ally", *Id* at ¶ 71.

16. DeHuff admits that he was never a director or an officer of Digital, *Id* at ¶ 72.

17. DeHuff admits that he was "an independent consultant" charged with "raising capital for Digital Ally", *Id* at ¶ 73.

18. DeHuff admits that Andy Ross "did not supervise or control" DeHuff's "activities", *Id* at ¶ 74.

19. DeHuff admits that he was an "independent contractor, not Andy Ross' employee"; that "[n]o one at Digital Ally – including Andy Ross – controlled the manner in which" DeHuff "performed" his "tasks", or DeHuff's "physical conduct in the performance of" those "tasks" or the "method or plan" of DeHuff's "work", *Id* at ¶ 75.

20. DeHuff admits that his deposition testimony, to the effect that he introduced "people to Andy …" Ross for purposes of selling Digital stock to them, "speaks for itself" , *Id* at ¶ 81.

21. DeHuff admits that his deposition testimony, to the effect that he "encouraged" the people he introduced to Andy Ross to buy the Digital stock by telling him that DeHuff himself thought it "was a good investment", "speaks for itself, *Id* at ¶ 82.

22. DeHuff admits that his deposition testimony, to the effect that he "arranged a meeting for" these prospective investors with Andy Ross, "speaks for itself", *Id* at ¶ 83.

23. DeHuff admits that his deposition testimony, to the effect that he expected Andy Ross to pay him for these introductions; that there "was an agreement that he would pay me 10 percent for everything I helped arrange", "speaks for itself", *Id* at ¶ 84.

24. DeHuff admits that his deposition testimony, to the effect that he used a Mississippi limited liability company called "Top Producers, LLC", the members of which were DeHuff and a man named Larry Posey to extend the "investment opportunity" represented by Digital to investors who would not otherwise qualify for such an investment, "speaks for itself", *Id* at ¶ 85.

25. DeHuff admits that his deposition testimony, to the effect that some of his "friends" and/or friends of Larry Posey "wanted to purchase some Digital Ally but could not

because the number of non-accredited investors were already at the maximum", "speaks for itself", *Id* at ¶ 86.

26. DeHuff admits that his deposition testimony, to the effect that the "guesses" that about "seven" people were then able to buy Digital stock from Top Producers, "speaks for itself", *Id* at ¶ 88.

27. DeHuff admits that his deposition testimony, to the effect that these seven included a man named "Hardie Perritt" and someone "from Louisiana", whose name DeHuff could not recall, "speaks for itself", *Id* at ¶ 89.

28. DeHuff admits that Mr. Paul Board's deposition testimony, to the effect that on March 13, 2004, Board entered into a subscription agreement whereby he agreed to buy 20,000 shares of what was then "TrophyCam stock" from TrophyCam, "speaks for itself", *Id* at ¶ 94.

29. DeHuff admits that this "Subscription Agreement" speaks for itself, *Id* at ¶ 95.

30. DeHuff admits that Paul Board's testimony that this "Subscription Agreement" was rendered "void" sometime thereafter when Board "was informed that" his "investment could not be accepted because of the issue with the state regulations", "speaks for itself", *Id* at ¶ 96.

31. DeHuff admits that Paul Board's deposition testimony, to the effect that on August 25, 2004, he entered into a second agreement with DeHuff whereby Board agreed to purchase Trophy Tech stock from <u>DeHuff</u>, "speaks for itself", *Id* at ¶ 97.

32. DeHuff admits that this second agreement with Paul Board, to the effect that for the Digital stock purchased by Board, the "stock certificate" was to "be made out to Thomas DeHuff and held for a period of time" until "timing of circumstances [would] allow shortest access to liquidation for said owner" "speaks for itself", *Id* at ¶ 98.

33. DeHuff admits that "the best explanation of DeHuff's role in raising capital for Defendant Digital Ally … can be found in the deposition testimony of Mr. Steven Board", a complete copy of which "is attached" to DeHuff's Response to the Second Motion "as Exhibit 4 and the deposition testimony of Larry Gene Ashley, … a copy of which is attached" to DeHuff's Response to the Second Motion "as Exhibit 5", *Id*., ¶ 8.

34. Board testified and DeHuff therefore admits that he met DeHuff some 15-18 years and that most of their discussions have been "probably more" by "telephone" than face-to-face, DeHuff Exhibit 4, 18:13-24.

35. Board testified and DeHuff thus admits that DeHuff "called [him] about a potential investment opportunity and that if I was interested, there was gonna be presentations in the Brookhaven [Mississippi] area on a given date and gave me a thumbnail sketch of what it was about", *Id*., 18:25-19:8.

36. Board testified and DeHuff thus admits that DeHuff told him, by phone, that there was going to be a presentation at the "Hampton Inn in Brookhaven"; that Board attended that presentation and that Andy Ross was the "primary speaker", *Id*., 21:15-22:15.

37. Board testified and DeHuff thus admits that DeHuff "made an introduction" of Andy Ross "and his acquaintance with that family"; that DeHuff "made primarily introductory comments" and that DeHuff explained that "he had been approached with this investment opportunity and thought it was a good one and wanted to make it – to make it available to other investors in the Brookhaven area, make the information available", *Id*., 33:5-34:23.

38. Board testified and DeHuff thus admits that "lawyer stuff, private placement memoranda or offering circulars, that kind of thing" were passed out at the meeting and that Board reviewed them both at the meeting and thereafter, *Id*., ¶ 34:24-35:8.

39. Board testified and DeHuff thus admits that in August of 2004, he met with DeHuff, Andy Ross and others at DeHuff's home in order to "talk about the investment subscription", *Id*., 35:15-36:25.

40. Board testified and DeHuff thus admits that DeHuff telephoned him to invite him to the meeting and said that it was " important" to attend, *Id*., 37:2-15.

41. Board testified and DeHuff thus admits that at the August meeting, "they" said, "we cannot keep your initial investment and so the alternate means proposed was to purchase the stock from Tom DeHuff and with – my understanding is that he would be provided reimbursement probably through the means of additional stock issue of Trophy Tech or Digital Ally which [Trophy Tech] was becoming", *Id*., 44:8-45:2.

42. Board testified and DeHuff thus admits that in the end, Board was actually going to be buying stock in Digital Ally from Tom DeHuff", *Id*., 48:8-11.

43. Board testified and DeHuff thus admits that Board's subscription agreement with Digital was what became "void and a new agreement took its place", *Id*., 55:5-56:6; i.e., a stock purchase agreement between Board and DeHuff, as the "seller" of the stock, *Id*., 59:7-60:5.

44. DeHuff admits that his deposition testimony, to the effect that according to Digital's stock issuance records, he received a distribution of 600,000 shares of Digital/Trophy Tech stock in exchange for his services in finding investors for Trophy Tech, "speaks for itself", DeHuff Response at ¶ 99.

45. DeHuff admits that his deposition testimony, to the effect that he "asked Andy to split the 600,000 shares into 300,000 for" him and "300,000 for Batala", LLC, a limited liability company of which DeHuff was owner, "speaks for itself", *Id* at ¶ 100.

46. DeHuff admits that his deposition testimony, to the effect that by e-mail dated February 24, 2004 he instructed Andy Ross to "do" his 600,000 shares of stock in precisely that manner, "speaks for itself", *Id* at ¶ 101.

47. DeHuff admits that his deposition testimony, to the effect that he did not "pay cent one" for any of these 600,000 shares, "speaks for itself", *Id* at ¶ 102.

48. DeHuff admits that his deposition testimony, to the effect that he is owed a further 50,000 shares by Digital as and for his 10% commission, "speaks for itself", *Id* at ¶ 109.

49. DeHuff admits that his deposition testimony, to the effect that he claims an additional 50,433 post-merger/post-split Digital shares beyond the 50,000 "unpaid commission" shares, because DeHuff says Andy Ross "agreed to it" and otherwise notwithstanding DeHuff's admission that he "didn't agree to give" Andy Ross "anything" for those shares, "speaks for itself", *Id* at ¶ 110.

50. DeHuff admits that his deposition testimony, to the effect that he is entitled to the remaining 50,00 shares and to the total of 150,000 shares clamed in this lawsuit because of "some intangible things, such as" the fact that DeHuff "provided just about all the money to start the company up" by "raising the capital", "speaks for itself", *Id* at ¶ 111.

## REPLY ARGUMENT

### I. BY "FINDING" PURCHASERS OF DIGITAL STOCK, BY "INTRODUCING" THOSE PURCHASERS TO DIGITAL/ANDY ROSS AND BY RECOMMENDING DIGITAL AS AN "INVESTMENT" THAT THESE INVESTORS SHOULD "TAKE A LOOK AT", DEHUFF HAS ENGAGED IN THE BUSINESS OF "EFFECTING TRANSACTIONS IN" DIGITAL STOCK, AND DEHUFF HAS OTHERWISE FAILED TO SATISFY HIS BURDEN OF DEMONSTRATING THAT THESE ACTIVITIES NOTWITHSTANDING, HE WAS SOMEHOW EXEMPT FROM REGISTRATION AS A BROKER/DEALER

Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1), "makes it unlawful for brokers to offer securities without registering themselves with the SEC", SEC v. Kenton Capital, Ltd., 69

F.Supp.2d 1, 13 (D. D.C. 1998). Although DeHuff contends that he is not and was not within the definition of "broker", "[a] 'broker' … is defined" in 15 U.S.C. § 78(c)(a)(4)(A) as "'**any person engaged in the business of effecting transactions in securities for the accounts of others**'", SEC v. George, 426 F.3d 786, 797 (6th Cir. 2005). Since the "operative term in this" as in any other § 15(a)(1) case "is 'effecting'", a word "which Webster's defines as 'something brought about by an agent or cause'" or having "'the capacity to achieve the desired result'", Wesbanco Bank Barnesville v. Rafoth, 106 F.3d 1255, 1260 (6th Cir. 1977), a person or entity "could be a broker even though securities transactions are only a small part of" his or its "business activity", SEC v. Kenton Capital, 69 F.Supp.2d at 13. All that is required is that the person have "regular participation in securities transactions", or "employment with the issuer of … securities", or receive "payment by commission as opposed to salary" or have a "history of selling the securities of other issuers", or "involvement in advice to investors and active recruitment of investors", SEC v. George, 426 F.3d 786, 797 (6th Cir. 2005). The case law as well as "SEC No-Action Letters interpreting the phrase have indicated that regularity of participation is the primary indicia of being 'engaged in the business'" of selling securities, SEC v. Kenton Capital, 69 F.Supp.2d at 12, and that can be and has been "demonstrated by such factors as the dollar amount of securities sold", *Id.*, by the fact that "several million dollars of securities" have been sold and by "the extent" of the "investor solicitation" that occurred, *Id*. at 12-13, *citing* UFITEC, S.A. v. Carter, 20 Cal.3d 238, 142 Cal. Rptr. 279, 571 P.2d 990 (1977). Where a person like DeHuff has "solicited investors by phone and in person" and "distributed documents … in the hope that potential investors would deposit their money", SEC v. Deyon, 977 F. Supp. 510, 518 (D. Me. 1997), he is a broker.

That is by congressional design. Digital and Andy have said it before: the "requirement that brokers and dealers register is of the utmost importance in effecting the purposes of" federal securities laws, Eastside Church of Christ v. National Plan, Inc., 391 F.2d 357, 362 (5th Cir. 1968). Registration "is the 'keystone of entire system of broker-dealer regulation'", Lawrence v. Richman Group Capital Corp., 358 F.Supp.2d 29, 36 (D. Conn. 2005), *quoting in part from* Roth v. SEC, 22 F.3d 1108, 1109 (D. C. Cir. 1994). A "broker-dealer that has registered with the SEC "is bound to abide by numerous regulations designed to protect prospective purchasers of securities" and "to ensure that 'securities are [only] sold by a salesman who understands and appreciates both the nature of the securities he sells and his responsibilities to'" investors, Roth v. SEC, 22 F.3d at 1109, *quoting in part from Persons Deemed Not to Be Brokers*, SEC Exchange Act Release No. 20,943 (May 9, 1984), 49 Fed. Reg. 20,512, 20,515 (1984).

For of these reasons, the SEC has well as the Courts have long held that "the burden is on a broker-dealer to prove his claimed exemption from" the registration provisions specified under federal law, SEC v. Culpepper, 270 F.2d 241, 246 (2nd Cir. 1959). Under the authority of SEC v. Ralston Purina Co., 346 U.S. 119, 73 S. Ct. 981, 97 L.Ed. 1494 (1953), "an issuer who claims the benefit of an exemption from § 5 [of the Exchange Act] for the sale of an unregistered security has the burden of proving entitlement to it", and the "rationale of this result applies as well to a broker-dealer who claims the benefit of a similar exemption" from registration, Gilligan Will & Co. v. SEC, 267 F.2d 461, 466 (2nd Cir. 1959) and *see*, SEC v. The American Foundation for Advanced Education of Arkansas, 222 F. Supp. 828, 830-31 (W. D. La. 1963) (it "is well established that any person who asserts the claim of an exemption from the Securities Act has the burden of proving its availability).

Here, DeHuff has wholly failed to satisfy his burden to show that merely "finding" investors and/or "introducing" investors and/or recommending stock to investors as a "good opportunity" is not "effecting the sale of securities" within the meaning of the Exchange Act. Although DeHuff might have suggested that he was an "employee" of Digital, as the issuer of the stock, and so exempt from registration pursuant to SEC Rule 3a4-1, 17 C.F.R. § 240.3a4-1, he denies that he was ever an employee of Digital or a partner, officer or director of Digital. While DeHuff does suggest now for the first time, that he "believed" that Andy Ross himself was a licensed or registered "broker", the fact that DeHuff has already denied that Andy Ross ever supervised or controlled his activities, or controlled the manner in which he performed his tasks, makes it impossible for DeHuff to claim that he "thought" he was an "associated person" or "agent" of a licensed broker-dealer within the meaning of § 15 of the Exchange Act, 15 U.S.C. § 78o(a)(1) and/or Miss. Code Ann. Stat. § 75-71-301. DeHuff is, upon the whole record now before this Court, an unregistered seller/broker of securities whose contract is, without more, squarely within the nullification provisions of § 29(b) of the Exchange Act.

## II. THE 150,000 SHARE "CONTRACT" WHICH DEHUFF WOULD HAVE THIS COURT ENFORCE IS SQUARELY WITHIN THE NULLIFICATION PROVISIONS OF § 29(B) FOR THE REASON THAT IT PROVIDES FOR THE PAYMENT OF UNLAWFUL COMPENSATION TO AN UNREGISTERED BROKER IN EXCHANGE FOR ILLEGAL SERVICES

To emphasize again, § 29(b) of the Exchange Act, 15 U.S.C. § 78cc(b) renders "void" each and every "contract made in violation of any provision of" the Act "'**and every contract … the performance of which involves the violation of … any provision of**'" the Act as "'regards to the rights of any person who, in violation of such provision shall have made or engaged in the performance of … such contract'", Regional Properties, Inc. v. Financial and Real Estate Consulting Co., 678 F.2d 552, 557 (5th Cir. 1982), *quoting from* 15 U.S.C. § 78cc(b). By its

terms, § "29(b) renders certain contracts void" and does "not limit that invalidity to contracts between issuers and sellers or to those between issuers and investors", *Id*. at 561. In enacting § 29(b) and the "nearly identical" provisions of § 215(b) of the Investment Advisors Act, 15 U.S.C. § 10b-15(b), "[a]t the very least, Congress must have assumed that "'these provisions could be raised defensively in private litigation to preclude the enforcement of an investment advisor's contract" in the case of the Investment Advisors Act, and a broker's contract in the case of the Exchange Act, *Id*. at 558, *quoting from* Transamerica Mortgage Advisors, Inc. v. Lewis, 444 U.S. 11, 17, 100 S. Ct. 242, 62 L.Ed.2d 146 (1979).

In order to invoke § 29(b), the complainant must show that "(1) the contract involved a 'prohibited transaction', (2) [the complainant] … is in contractual privity with the defendant, and (3) he is 'in the class of persons the Act was designed to protect'", *Id*. at 559. Turning first to the issue of what is or is not a "prohibited" transaction, "[s]ection 29(b) does not render void only those contracts that 'by their terms' violate the Act", *Id*. at 560. DeHuff's suggestion to the contrary, notwithstanding, a "statute that voided only contracts by which persons have agreed in express terms to violate the Act would be so narrow as to be a waste of the … time spent in its enactment", *Id*. Nor does "section 29(b) void[ ] only those contracts 'which by their terms' necessarily involve a violation of the Act in their making or performance", an "interpretation" which would insert the "word 'necessarily' into the statute when it simply is not there", *Id*. In truth, "section 29(b)" renders "voidable those contracts that are either illegal when made or as in fact performed", *Id*. and a "violation" of the securities laws sufficient "to trigger the application of" § 29(b) needs only to have occurred in the making or "performance of the contract" sought to be avoided, *Id*. at 561.

For these reasons, the Fifth Circuit has also held that an "unregistered broker" cannot enforce a "contract engaging him to sell securities using interstate facilities" of the kind that DeHuff has so obviously used in "effecting the sale" of Digital stock to his investors, *Id*. at 564. The "fact that the unregistered broker has performed under the contract should not alter that result", *Id*. Were it to do so, "there would be no civil remedy for the failure to register", since "[i]f the broker who has performed can recover his commission despite non-registration, then the prohibition is a toothless tiger", *Id*. In this case as in all such cases, the "illegality of the transaction precludes the recovery of damages for breach and any other judgment aimed at enforcement of the tainted contract", *Id*. There can be no question, then, that the contract which DeHuff would have this Court enforce, in fact a "prohibited transaction".

As to whether Digital and Andy Ross are in "contractual privity with" DeHuff and/or whether they are in "a class of persons the Act was designed to protect", *Id*. at 560, "privity" in this case is "established beyond dispute", *Id*. After all, Digital, Andy and DeHuff are and were "the only parties to the" many "contracts" which DeHuff claims to have made for payment of the additional and unlawful consideration, *Id*. With regard to the issue of whether Digital and/or Andy are "in the class of persons the Act was designed to protect", § "29(b) is directed at nullifying the rights of the violator, not at the standing of the complainant to assert the right to the remedy created by this section", *Id*. at 560 (internal quotation omitted). Standing, if that is indeed the correct term, exists whenever the "'interest sought to be protected by the complainant is arguably within the zone of interest to be protected or regulated by the statute … in question'", *Id*., *quoting in part from* Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 152-53, 90 S. Ct. 827, 829-30, 25 L.Ed.2d 184, 187 (1970).

The "essence of the question" of Digital and/or Andy's membership "in the class of persons" that § 29(b) "was designed to protect" is "'whether the … statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief'", *Id*. at 560, *quoting from* Warth v. Seldin, 422 U.S. 490, 500, 95 S. Ct. 2197, 2205, 45 L.Ed.2d 343, 355 (1975). In this case, § 29(b) "does not in terms limit the class of persons who may invoke its contractual voidness provisions to investors" and while "the law was enacted to protect the public interest and the investor, its protection extends beyond those who buy securities", *Id*. That statute, like any other, "must be read in light of" its purpose, and neither this nor any other court "should … seek to obviscate the obvious", *Id*., fact that it applies to Digital and Andy Ross as much as to any other person. In summary on this point, as an "unregistered broker", DeHuff cannot "enforce" the purported 150,000 share contract, notwithstanding that it may be "'perfectly lawful on [its] face'", given the simple fact that his "performance [as an] unregistered broker resulted in a violation of the Act", Couldocks & Bohan, Inc. v. Societe Generale Securities Corp., 93 F.Supp.2d 220, 231 (D. Conn. 2000), *relying upon* Regional Properties, Inc. v. Financial and Real Estate Consulting Co., 678 F.2d 552 (5th Cir. 1982).

## III. DEHUFF'S PURPORTED CONTRACT FOR AN ADDITIONAL 150,000 DIGITAL SHARES IN COMPENSATION FOR "SERVICES" IS VOID BY OPERATION OF § 29(B), WITHOUT REGARD TO THE DOCTRINES OF *IN PARI DELICTO*, ESTOPPEL OR ANY OTHER EQUITABLE DEFENSE AND OTHERWISE AS A RESULT OF DEHUFF'S FAILURE TO SUSTAIN HIS OWN BURDEN UNDER MISSISSIPPI LAW TO PROVE THAT THE CONTRACT IS VALID AND FOR LAWFUL PURPOSES

DeHuff has sued Digital and Andy Ross either for an order commanding them to "specifically perform" the alleged contract for additional commissions or for damages as a result of their breach of that contract. Digital and Andy Ross have asserted no counterclaim, they have

sought no affirmative relief from this Court. They have done no more, nor less, than interpose defenses, one of which is the bar of § 29(b) of the Exchange Act.

As a plaintiff seeking to enforce a contract under Mississippi law, DeHuff "has the burden of proving by a preponderance of the evidence … the existence of a valid and binding contract", Warwick v. Matheney, 603 So.2d 330, 336 (Miss. Sup. 1992). In Mississippi, as elsewhere, "[c]ontractual rights are fundamental, but contracts contrary to public policy are unenforceable", Estate of Reaves v. Owen, 744 So.2d 799, 801 (Miss. App. 1999). There "is no doubt", therefore, that the Mississippi "courts have the duty and the power to declare void and unenforceable contracts made in violation of law or in contravention of the public policy of" this state and that will exercise that power when, *inter alia*, "the principal purpose of the contract directly furnishes aid and protection to an illegal enterprise", Smith v. Simon, 224 So.2d 565, 566 (Miss. Sup. 1969).

Here, DeHuff admits that he did not have such a securities license at the time he was "finding" and/or "introducing" and/or "recommending" Digital stock to investors. His contract for an additional 150,000 shares of stock in compensation for those services is no less illegal under Mississippi law than it is under federal law in the form of § 29(b). Therefore, it is DeHuff's burden to show, these principles notwithstanding, that his "contract" for an additional 150,000 Digital shares as "commission" for his services is nonetheless valid, enforceable and concordant with the "public policy" which, on its face, it seems so clearly to violate. Upon the record, DeHuff has not satisfied that burden, indeed he has not even attempted to satisfy it.

Second, with regard to Digital and Andy Ross's ability to raise the defense of voidability under § 29(b), there is nothing in the case law to suggest "that only an innocent party may seek to avoid" such a contract, Lawrence v. The Richman Group Capital Corp., 2005 WL 1949864 at

*2. Neither "the statutory language nor principles of equity require such a result" and, on the contrary, § 29(b) "does not by its terms limit the class of persons who may void a contract to innocent parties", *Id*. Rather, the "illegality of the transaction" automatically "precludes the recovery of damages for breach and any other judgment aimed at enforcement of the tainted contract", and while that may appear to be "harsh" from "the standpoint of [a] broker" like DeHuff, it "'seems to be what Congress intended'", Regional Properties, 678 F.2d at 561, *quoting in part from* Eastside Church, 391 F.2d at 362.

Third, far from eliminating a potential "defense" to DeHuff's recovery, the doctrine of *pari delicto* actually forecloses it. The reason lies in the history of the doctrine itself. *Pari delicto* "is grounded on two premises: first, that courts should not lend their good offices to mediating disputes among wrongdoers", and "second, that denying judicial relief to an admitted wrongdoer is an effective means of deterring illegality", Bateman Eichler Hill Richards, Inc. v. Burner, 472 U.S. 299, 306, 105 S. Ct. 2622, 86 L.Ed.2d 215 (1985). Indeed, to "'refuse to grant either party to an illegal contract judicial aid for the enforcement of his alleged rights under it tends strongly towards reducing the number of such transactions to a minimum'", *Id*. at 307, *quoting from* McMullen v. Hoffman, 174 U.S. 639, 669-70, 19 S. Ct. 839, 43 L. Ed. 1117 (1899). The "more plainly parties understand that when they enter into contracts of this nature, they place themselves outside the protection of the law", at least insofar as "that protection consists in aiding them to enforce such contracts", the "less inclined will they be to enter into them", *Id*. (internal quotation omitted). No court can lend "its assistance in any way toward carrying out the terms of a contract", the "inherent purpose of which is to violate the law" and if "both parties are" *in pari delicto* in that regard, "**the law will leave them where it finds them**", Couldocks & Bohan, 93 F.Supp.2d at 223.

In this case, the law "finds" Andy Ross who allegedly entered into this contract with DeHuff without any remaining interest in Digital, a now-public company, the stock of which is worth millions of dollars. It also finds DeHuff in possession of hundreds of thousands of Digital shares worth millions of dollars, all of which were received for services that violated both state and federal law. Fortune has already left Andy Ross in his present condition, and by denying him any remedy upon his contract for yet more illegal compensation, the law should leave DeHuff where it finds him.

This is not to say that the doctrine of *in pari delicto* and/or any other equitable defense may not have a place in § 29(b) actions. They do, but only in the context of the "equitable cause[s] of action for rescission or similar relief" which the courts have recognized "by implication" from § 29(b), Regional Properties, 678 F.2d at 558. The Fifth Circuit itself has had "no hesitation in holding" that in the context of independent actions for rescission and restitution brought against unregistered brokers for cancellation of contracts with the broker and for the recovery of consideration paid to the broker, "there are such defenses and … they, in fact, encompass all the traditional equitable defenses", *Id*. at 562. It is in that context when "an illegal brokerage contract has been performed, and some or all of the fees due the broker have been paid", that "the questions of recoverability of what has been paid and of the rights of the broker who has rendered valuable services" are "dealt with as equitable issues", *Id*. at 564. It is only in those judicially-recognized actions against the broker for rescission of the brokerage contract and the recovery of monies paid under it, that "[t]he fact that public policy embodied in the securities law prohibits enforcement of the contract" may "not alone [be] a sufficient reason to allow even an innocent party to retain an unjust enrichment at the expense of a culpable one", *Id*. In these cases and in these cases alone "[r]esolution of the problem must be found in a balance of the

factors … the extent of the enrichment and the degree of unjustness what, by its retention, weighed against the policy against enforcement, the extent of the non-violator's participation, and whether a judgment depriving the violator of the benefits received will subvert the policy underlying the rule of law that makes the transaction illegal", *Id*.

This is not such a case. Digital has sued DeHuff for nothing and has sought to recover nothing from him, notwithstanding the fact that the hundreds of thousands of shares which DeHuff has already received are the no less the ill-gotten product of unlawful conduct than the 150,000 shares which DeHuff hopes to recover now. To the extent that the doctrine of *pari delicto* or any other equitable principle has any application here, it is to leave the parties where "it finds them"; i.e. Digital with no hope of recovering the hundreds of thousands of shares which it has already given to DeHuff and DeHuff without any hope of receiving more.

Respectfully submitted,

MCDOWELL, RICE, SMITH, & BUCHANAN

*/s/ James F.B. Daniels*

James F.B. Daniels, MO Bar No. 30003
A. Jeffrey Misler, MO Bar No. 37383
605 W. 47th Street, Suite 350
Kansas City, MO 64112
Telephone: (816) 753-5400
Facsimile: (816) 753-9996
jdaniels@mcdowellrice.com
jmisler@mcdowellrice.com

Marcus M. Wilson, MS Bar # 7308
BENNETT LOTTERHOS SULSER & WILSON
One Jackson Place, Suite 1400
188 East Capitol Street
Jackson, MS 39205
Telephone: (601) 944-0466
Facsimile: (601) 944-0467
mwilson@blswlaw.com

ATTORNEYS FOR DEFENDANTS

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing was filed this 11th day of August, 2009 with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic Filing to those persons requesting electronic notification and by U.S. mail, postage prepaid to the following:

B. Clint Gardner
THE GARDNER GROUP, P.A.
P.O. Box 1163
Brookhaven, MS 39601-1163

*/s/ James F.B. Daniels*

.